344

UNITED STATES, Appellee,

v.

Donald J. GROSSKREUTZ, Sergeant, U. S. Air Force, Appellant.

No. 32,376.

ACM S–24360.

U. S. Court of Military Appeals.

Sept. 18, 1978.

For appellant—*Captain Kenneth R. Powers* (argued); *Colonel Jerry E. Conner* (on brief); *Colonel Robert W. Norris; Major Byron D. Baur* (on brief).

For appellee—*Major Alvin E. Schlechter* (argued); *Colonel Julius C. Ullerich, Jr.* (on brief); *Captain John S. Odom, Jr.* (on brief).

Opinion of the Court

PERRY, Judge:

The appellant was convicted by a special court-martial of possession of marijuana, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad-conduct discharge, confinement for 5 months and reduction to the lowest enlisted grade. The United States Air Force Court of Military Review affirmed on April 6, 1976, in an unpublished opinion. We granted review to consider the appellant's contention that a quantity of marijuana, discovered in his automobile with the aid of a marijuana detection dog and seized pursuant to a search authorization which was made upon the basis of the dog's conduct, was erroneously admitted as evidence during his trial in violation of the Fourth Amendment to the Constitution of the United States. Since we perceive no error in the procedures which led to the seizure of the evidence, we affirm.

I

The events which culminated in the appellant's arrest and conviction commenced when, on October 31, 1975, an informant gave Security Police Investigator Oliver information that another individual had told him (the informant) that he (the other individual) "believed" hashish could be found in an "old battered Mercedes" automobile which belonged to the appellant. The informant reported that the automobile was parked in the parking lot at the Civil Engineering end of Building 501 of Hahn Air Base. Based on the foregoing information which was passed on by Special Agent Oliver to his colleagues, Sergeant Eckard and a marijuana detection dog named Tega were dispatched to the parking lot. Sergeant Eckard, the dog's handler, was told that the police investigators had reason to

believe that a quantity of hashish was in an old battered Mercedes automobile which was parked in the Civil Engineering area parking lot of Building 501.[1] Sergeant Eckard walked the dog around in the parking lot briefly and then proceeded to the appellant's automobile which was parked in the lot unattended. The dog "alerted," thereby signaling the presence of something on both the driver and the passenger sides of the automobile.[2] Sergeant Eckard then led the dog away from the automobile "to clear his nose" and thereafter led him back, at which time Tega again "alerted" on both sides of the automobile. Thereupon, Sergeant Eckard called the Security Police Investigations Section office for assistance and was told that Sergeant Luffman, the Noncommissioned Officer in Charge, would arrive within 10 to 15 minutes and that Sergeant Eckard should "stand by." While Sergeant Eckard and the dog were awaiting Sergeant Luffman's arrival, the appellant Grosskreutz and two persons, a man and a woman, approached the automobile. The appellant and his party were detained pending the arrival of Sergeant Luffman and other police personnel. Upon Sergeant Luffman's arrival, Sergeant Eckard told

him that the dog had "alerted" on the appellant's automobile. Sergeant Luffman requested that the dog demonstrate in his presence the conduct thus characterized. The ensuing conduct of the dog was described by Sergeant Eckard:

> We started on the passenger side, the dog alerted, came around the side and he sniffed on the driver's side, the cracks on the windows and he alerted on the door. This time he got up on top of the door and was trying to get in.

Sergeant Luffman then informed the appellant that, based upon information which they had received together with the conduct of the dog, they had reason to believe that a prohibited substance was in the automobile and inquired whether the appellant would consent to a search of the automobile. The appellant refused.[3] Sergeant Luffman then telephoned the base commander, Colonel Brown, and advised him that the dog had "alerted" in his presence, thereby signaling the presence of narcotics in the appellant's automobile. The dog's conduct was described by Sergeant Luffman as "tugging on the strap, I guess you'd call it, the handler has, very strong sniffing action. . . ." The same description was given

1. Special Agent Tatalajski testified that "Sergeant Eckard was briefed that there may probably be drugs in an automobile parked in the vicinity of Building 501 on Hahn Air Force Base. It may be in a car that is adjacent to the end of Building 501, the end relating to the Transportation Management Office."

2. Sergeant Eckard testified that he is a "patrol dog handler" and that he was a "handler for a drug detection dog," having been certified as such in April 1974, at which time he commenced working with Tega. He testified that he and Tega had made approximately 1201 drug inspections as of the date of the appellant's trial; that Tega had received training in the detection of marijuana and heroin and had been certified by the Base Commander who had observed the dog perform. In that regard he testified: "We have to go before the Base Commander every 90 days with our NCOIC, he hides the stuff, the Base Commander comes in and he knows where it is, then we come in (without knowing where the narcotics are hidden) and run the dog around, the Base Commander views the dog and certifies him. We plant the training aids and he finds them and then the Base Commander certifies him." As to how he, Sergeant Eckard, knows when Tega

has alerted, he testified, "He sniffs at it real hard; sometimes if it's low he tries to dig it out or get to it." He also testified that he (Tega) gets excited, sniffs real hard, tries to get up to it, climbs upon the window, looks around, goes back to it, gets more excited and sniffs harder.

3. Sergeant Luffman testified that he went to the appellant who was sitting in a vehicle and identified himself. He testified further that he read certain "rights" from Air Force Regulations and upon completion he inquired whether the appellant understood his rights. "He said, 'yes', asked him if he wanted a lawyer, he looked at me and said, 'not now.' I said 'well, I only have one question I intend to ask you at the present time, that is will you give me permission to search your car?' He didn't answer me at first. He looked at me and said, 'and if I say no' I said, 'well I'll cross that bridge when I come to it.' He said 'no.' I said 'no what?' He said 'no I'm not giving you my permission to search my car. I want a lawyer.' I said 'ok, fine, make yourself comfortable. Stay right here. Arrangements will be made for you to see a lawyer.'"

Colonel Brown concerning the dog's conduct on the driver's side of the vehicle except that it was described there as being a "stronger action than he had on the right side." Additionally, Colonel Brown was already familiar with Tega's olfactory capabilities.[4] Upon the basis of the information thus given him, Colonel Brown verbally authorized Sergeant Luffman and his team to conduct a search of the automobile. Thereafter, Sergeant Luffman telephoned the Vehicle Registration office at Heidelberg and, upon inquiry, received confirmation that the vehicle was registered in the name of the appellant. Luffman then told the appellant that Colonel Brown had authorized him to search the automobile. The appellant thereupon unlocked the doors. Drug paraphernalia and substances later identified as marijuana were discovered in the automobile. The appellant was thereupon arrested and charged with possession of marijuana. At his trial, the evidence thus seized was admitted over the appellant's objection that the evidence was obtained in violation of the Fourth Amendment to the Constitution of the United States.

## II

The appellant argues that use of the dog to sniff the air around his automobile constituted a "search" which could not have been made absent antecedent probable cause and search authorization. He argues further that the information given Sergeant Oliver was insufficient to constitute probable cause. Finally, he argues that since the initial use of the dog commenced without probable cause and search authorization, all action taken as the result of the dog's conduct was likewise unlawful as "fruits of the poisonous tree." He relies upon *United States v. Solis,* 393 F.Supp. 325 (C.D.Cal., 1975), in which a United States District Court suppressed evidence discovered and seized through the use of a dog.[5] That decision, however, was reversed by the United States Court of Appeals for the Ninth Circuit in an opinion which held that the use of the dog did not constitute a search but, rather a "monitoring of the air in an area open to the public in determining the possible existence of a criminal enterprise nearby." *United States v. Solis,* 536 F.2d 880, 881 (9th Cir. 1976). The appellant also relies upon *United States v. Thomas,* 1 M.J. 397 (C.M.A.1976), where Judge Ferguson (concurring in the result) expressed the view "that the use of a dog, trained to ferret out the presence of contraband drugs, for that purpose constitutes a 'search' " which was, under his view of the *Thomas* circumstances, unreasonable. That view, however, is at variance with the previously stated view of this Court in *United States v. Unrue,* 22 U.S.C.M.A. 466, 470, 47 C.M.R. 556, 560 (1973), that use of a trained dog to detect the odor of narcotics did not constitute a prohibited search and was not, under the circumstances of that case, unreasonable. It is axiomatic that *Unrue* must control our decision in this case unless inapplicable or not in accord with current principles of Fourth Amendment law.

It is generally known that marijuana radiates a distinctive odor which can be detected by individuals acquainted with the odor, and by trained dogs. *United States v. Guerrera,* 554 F.2d 987 (9th Cir. 1977); *United States v. Solis, supra; United States v. Bronstein,* 521 F.2d 459 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976); *United States v. Pond,* 523 F.2d 210 (2d Cir. 1975), *cert. denied* 423 U.S. 1058, 96 S.Ct. 794, 46 L.Ed.2d 649 (1976); *United States v. Martinez-Miramontes,* 494 F.2d 808 (9th Cir. 1974), *cert. denied* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *United States v. Falley,* 489

---

4. Colonel Brown had previously observed Tega perform.

5. But see *United States v. Martinez-Miramontes,* 494 F.2d 808 (9th Cir. 1974), *cert. denied* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974), in which the Ninth Circuit had previously held that no prohibited search was involved when a customs officer sniffed around a crevice in the trunk of an automobile. The court saw no distinction between what the customs officer did there and those cases involving the plain view doctrine. *See e. g. United States v. Belperio,* 452 F.2d 389 (9th Cir. 1971).

F.2d 33 (2d Cir. 1973); *United States v. Lewis,* 392 F.2d 377 (2d Cir. 1968), *cert. denied,* 393 U.S. 891, 89 S.Ct. 212, 21 L.Ed.2d 170 (1968); *People v. Campbell,* 67 Ill.2d 308, 10 Ill.Dec. 340, 367 N.E.2d 949 (1977). It is primarily for that reason that persons involved in the trafficking of narcotics often attempt to conceal the odor with talcum powder and mothballs. *See United States v. Fulero,* 162 U.S.App.D.C. 206, 498 F.2d 748 (1974); *United States v. Solis, supra; United States v. Bronstein, supra.* Thus the existence of telltale odors of marijuana and other narcotics that emit odors provides useful information to investigating law enforcement officials concerning the location and proximity of prohibited drugs. Indeed, the Supreme Court has recognized that the existence of such odors can be convincing evidence in determining whether probable cause exists to believe that a prohibited substance is located within a certain place. In *Johnson v. United States,* 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947), police, acting on information given them by an informant, went to a hotel and while in the hallway adjacent to Room 1, recognized what to them was the "distinctive and unmistakable" odor of burning opium. Without first obtaining a search warrant or consent of the occupants, they entered the room and discovered and seized incriminating opium and smoking apparatus, warm from recent use. In holding the warrantless entry and search of the hotel room unlawful, the Court noted that if testimony concerning the presence of the odors had been made before a magistrate and he had found the affiant qualified to know the odor as that of a forbidden substance, such would have justified the issuance of a search warrant. Said the Court, "Indeed it might very well be found to be evidence of most persuasive character." *Id.* at 13, 68 S.Ct. at 369. Implicit in the Court's observation was, we believe,

that no unlawful search occurred when the police, using their own senses, detected the odor of opium in the common hallway outside the hotel room. The detection of the odor and recognition of it as the odor of opium, we believe, constituted probable cause to believe that opium was in the room and that if that information had been sworn to before a magistrate, it would have supported the issuance of a search warrant. It is thus clear that detection of narcotics by police smelling the odor is a proper method of establishing probable cause. *Johnson v. United States, supra.*

While the Supreme Court has not expressly ruled upon the use of narcotic detection dogs as requiring antecedent probable cause and search authorization, a recent decision by that Court appears instructive. In *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the Court affirmed the decision of the First Circuit which held, *inter alia,* that, based upon the conduct of a marijuana detection dog which signaled the presence of a controlled substance (marijuana) inside a footlocker, the police had probable cause to believe that the footlocker contained a controlled substance when, without first obtaining a search warrant, they opened it. The Court condemned the warrantless opening of the footlocker because no exigency was shown which might have brought the case within the narrow exceptions to the warrant requirement. Of significance here is the Court's recognition that on the record there presented "the issuance of a warrant by a judicial officer was reasonably predictable." [6] It was the unauthorized and nonconsensual opening of the locker and the inspection of its interior that constituted the unlawful search, not the use of the dog. Surely the dog's conduct constituted evidence to which the Court alluded in its observation that "on this record the is-

---

**6.** *United States v. Chadwick,* 433 U.S. 1, 15, 97 S.Ct. 2476, 2486, 53 L.Ed.2d 538 (1977). The Court affirmed the suppression of the seized marijuana, thereby accepting the holding below that "probable cause alone was . . . not enough to sustain the warrantless search. On the premise that warrantless searches are per

se unreasonable unless they fall within some established exception to the warrant requirement, the Court of Appeals agreed with the District Court that the footlocker search was not justified either under the 'automobile exception' or as a search incident to a lawful arrest." *Id.* at 6, 97 S.Ct. at 2480.

suance of a warrant by a judicial officer was reasonably predictable." Implicit within the Court's recognition of the existence of probable cause was, we believe, approval of the use of the marijuana detection dog.[7]

As the above authorities attest, use of the sense of smell by the police, *Johnson v. United States, supra*, or by trained dogs, *United States v. Chadwick, supra, United States v. Solis, supra*, while in public areas accessible to them, is a useful aid to law enforcement officials in determining the existence of probable cause to believe that contraband exists within a certain locale. And "evidence acquired by unaided human senses from without a protected area is not considered an illegal invasion of privacy." *United States v. Solis, supra* at 881. An odor thus identified constitutes "a physical fact indicative of possible crime." *Taylor v. United States*, 286 U.S. 1, 6, 52 S.Ct. 466, 467, 76 L.Ed. 951 (1932); *United States v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Pond, supra; United States v. Walker*, 522 F.2d 194 (5th Cir. 1975); *United States v. Johnston*, 497 F.2d 397 (9th Cir. 1974); *United States v. Martinez-Miramontes, supra; United States v. Brown*, 487 F.2d 208 (4th Cir. 1973), *cert. denied*, 416 U.S. 909, 94 S.Ct. 1617, 40 L.Ed.2d 114 (1974); *United States v. Lewis, supra; State v. Elkins*, 47 Ohio App.2d 307, 354 N.E.2d 716 (1976); *State v. Quatsling*, 24 Ariz.App. 105, 536 P.2d 226 (1975); *People v. Campbell, supra*. As the Ninth Circuit observed in *United States v. Solis, supra* at 882:

Dogs, because of their keen olfactory sense, have long been used to assist police in search and rescue missions . . . Detection of contraband is a similar and related task. The recent proliferation .of crimes involving transportation of drugs and explosives has led naturally to the training and use of dogs . . .. to detect the presence of such contraband.

The appellant argues that use of the dog to sniff the air around his automobile was prohibited because it intruded into an area in which he had a justifiable expectation of privacy, to wit, his automobile, and that, absent antecedent search authorization, use of the dog was prohibited for the same reason the use of a detectaphone was prohibited in *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). A similar argument was made and rejected in *United States v. Unrue, supra*. Because the circumstances surrounding use of the dog here are distinguishable from those in *Unrue*, we will examine the contention as it relates to the instant case.[8] In *Katz* the Federal Bureau of Investigation attached a listening and recording device to the exterior of a public telephone booth known to have been used frequently by the accused. The listening device enabled the FBI to eavesdrop on Katz's conversations. At Katz's trial on a federal indictment which charged him with transmitting wagering information, the court admitted highly incriminating conversations between Katz and other individuals. Reversing Katz's conviction, the Supreme Court held that by taking the action he did, *i. e.*, closing the door of the phone booth, paying the toll and

---

7. Obviously a description of the dog's conduct, training and experience by a knowledgeable person who can interpret the conduct of the dog as signaling the presence of the controlled substance would constitute the minimal requirement for a finding of probable cause. *United States v. Chadwick, supra; Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947).

8. In *United States v. Unrue*, 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973), all occupants of the automobile were ordered to disembark. The dog was then permitted to sniff around all the occupants of the automobile and inside the vehicle. The majority found the use of the dog "reason-

able" as a proper exercise of the command authority to prevent introduction of dangerous drugs into the military environs. The Court specifically rejected the argument that *Katz* prohibited the use of the dog because "the threat to any justifiable expectation of privacy as to odors emanating from it was just 'not of impressive dimensions.' " *Id.* at 470, 47 C.M.R. at 560. In his dissent, Judge Duncan expressed the view that the entire procedure which led to the discovery of the drug was nonconsensual, and without probable cause to believe the vehicle contained drugs as well as too general in scope and thus prohibited under the general warrant provisions of the Fourth Amendment.

speaking into the telephone, he had manifested an expectation of privacy and that "the Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth . . . ." *Id.* at 353, 88 S.Ct. at 512. Of significance here is the Court's determination that it was Katz's justifiable expectation of privacy that was unlawfully intruded upon. The Court noted that efforts at deciding "whether . . . a given 'area' . . . is 'constitutionally protected' deflects . . . from the problem" which was there being considered. Said the Court (*id.* at 351–52, 88 S.Ct. at 511):

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. See *Lewis v. United States,* 385 U.S. 206, 210, 87 S.Ct. 424, 17 L.Ed.2d 312; *United States v. Lee,* 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202. But what he seeks to preserve as private even in an area accessible to the public may be constitutionally protected. See *Rios v. United States,* 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688; *Ex Parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877.

In the view of one member of the Court, the justifiability of one's expectation of privacy depends upon two factors: "[F]irst that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). *Katz* thus protects against warrantless intrusions in those cases in which the expectation of privacy is one which society is prepared to recognize as reasonable. The closeting of himself within the telephone booth to insure that his conversation would be heard only by those intended was clearly the manifestation of such an expectation by Katz which society recognizes as reasonable. For it must be remembered that the FBI eavesdropped on not only the incriminating conversations but on nonincriminato-

ry ones as well. In the instant case it is evident that the appellant took care to manifest an expectation of privacy by concealing the marijuana from visible detection in his locked automobile. But any expectation that the odor of marijuana will not escape from his automobile into the surrounding air space and be recognized as such is clearly unreasonable. See *United States v. White,* 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). See also *United States v. Solis, supra; United States v. Bronstein, supra; United States v. Pond, supra; United States v. Martinez-Miramontes, supra; United States v. Falley, supra; United States v. Lewis, supra; Johnson v. United States, supra.* We discern no distinction in the reported cases between the reasonableness of one's expectation that the odor of marijuana will not be detected by trained marijuana detection dogs as opposed to humans. *Compare Johnson v. United States, supra,* and *United States v. Johnston, supra, with United States v. Solis, supra; United States v. Bronstein, supra,* and cognate cases. *Katz* poses no impediment to the use of trained marijuana detection dogs and their handlers in public areas to monitor the surrounding air spaces for the presence of controlled substances. See *United States v. Solis, supra.*

It is clear that, acting upon unconfirmed information, the handler and the dog were on public property, located on a military installation from which they were not excluded. They needed no prior search authorization to be where they were. The appellant could have no justifiable expectation that the odor of marijuana, secreted within his parked automobile, would not exude into the surrounding air space. We hold that under these circumstances the use of a trained dog to corroborate the information that had been communicated to them was a reasonable and useful technique which did not intrude upon the Fourth Amendment. The subsequent description of the dog's conduct to Colonel Brown as indicating the presence of marijuana within the automobile thus constituted evidence of the "most persuasive character" of that fact. *Johnson v. United States, supra; United States v.*

*Chadwick, supra.* Based upon that information, Colonel Brown could and evidently did conclude that probable cause existed to believe that there was marijuana in the automobile. The resulting authorization which he gave to search the automobile and to seize the marijuana, based as it was upon probable cause, was proper. The evidence was therefore properly admitted.

The judgment of the United States Air Force Court of Military Review is affirmed.

Chief Judge FLETCHER and Judge COOK concur.